*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0566**

In the Matter of the Welfare of the Children of: C. D. B., Parent.

**Filed October 6, 2014
Affirmed
Reilly, Judge**

Hennepin County District Court
File No. 27-JV-13-8164

William M. Ward, Hennepin County Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, Minnesota (for appellant mother C.D.B.)

Michael O. Freeman, Hennepin County Attorney, Cory A. Carlson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Keilembo D. Ellison, Minneapolis, Minnesota (for respondent father L.H.)

William M. Ward, Hennepin County Public Defender, Colin T. Nelson, Assistant Public Defender, Minneapolis, Minnesota (for respondent father J.B.)

Kiri Somermeyer, Bruce Jones, Faegre Baker Daniels LLP, Minneapolis, Minnesota (for guardian ad litem Remy Huerta)

Considered and decided by Reyes, Presiding Judge; Peterson, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REILLY**, Judge

Appellant-mother challenges the termination of her parental rights, arguing that

the juvenile division of the district court (the juvenile court) clearly erred by finding that

the county made reasonable efforts to reunite appellant with her children and further asserting that termination was improper because the county had not yet finalized a permanency plan. Because (1) clear and convincing evidence supports the juvenile court's finding that the county made reasonable efforts to reunify the family and (2) appointment of the Commissioner of Human Services as the children's guardian was appropriate under controlling Minnesota statute, we affirm.[1]

## FACTS

On March 4, 2013, appellant went to the Hennepin County Medical Center (HCMC) reporting that she was sick. Hospital staff diagnosed appellant as having major depression with psychotic features and a history of posttraumatic stress disorder (PTSD) and attention deficit hyperactivity disorder (ADHD) and reported that she was "psychotic," "delusional," and suffering from "auditory hallucinations." Appellant told hospital staff that a "guy under my stairs was messing with my head" and that "they gassed my house." Appellant was treated in the emergency room and transferred to the inpatient psychiatric unit.

Appellant brought her children with her to the hospital. Hospital staff determined that appellant was unable to care for her children, and they were taken to St. Joseph's Home for Children. On March 7, 2013, the juvenile court held an emergency protective

---

[1] Appellant C.D.B. challenges the juvenile court's order terminating her parental rights to her children Tam.B., born December 4, 2009, and K.B., born June 21, 2011. The juvenile court's order also terminated the parental rights of Tam.B.'s and K.B.'s father, J.B., and a separate order transferred permanent physical and legal custody of an older child, Tat.B., to that child's father, L.H. These matters have not been challenged on appeal.

care hearing and issued an order for protective care and out-of-home placement, finding that the children were in an unstable environment, that they were placed in danger due to the mother's "mental health or behavioral issues," and that they should continue to remain in foster care. The juvenile court also assigned a child protection worker to appellant's case.

During her hospitalization, hospital staff reported that appellant was "unreliable" about staying in the hospital and taking her medications and could not take care of herself in the community. HCMC petitioned for judicial commitment of appellant, and the mental health division of the district court (the mental health court) continued the matter for six months and imposed certain conditions, including that appellant

> a. voluntarily remain at Hennepin County Medical Center until duly discharged, and follow all directions of the treating doctor and treatment team;
> b. take all prescribed medications as prescribed;
> c. cooperate with all requests for testing to detect chemical use;
> d. cooperate with aftercare planning and follow the aftercare plan;
> e. cooperate with the County social worker monitoring the case, including but not limited to, signing releases of information and making application for any public or private benefits available for [her] care and treatment;
> f. return phone calls from the caseworker and keep appointments; [and]
> g. not engage in any assaultive, threatening, or intimidating behavior, including behavior which results in destruction of property.

HCMC released appellant from inpatient psychiatric care on March 22. Appellant spoke with her doctors at HCMC regarding her discharge plan and treatment plan. Appellant indicated that she wanted to continue working with a clinical psychologist at

3

NorthPoint Health and Wellness (NorthPoint) with whom she had worked in 2010 and 2012. HCMC directed appellant to follow up at NorthPoint, where her primary care, individual therapy, and psychiatric services could be addressed through one provider. The juvenile court also referred appellant to a mental health case manager who could help appellant stabilize her mental health.

In April, appellant admitted herself to the hospital and reported that she had stopped taking her medications and was having delusions and hearing voices telling her that she was "evil" and needed to get out of the house. The child protection worker visited appellant in the hospital and offered her a variety of services, including an Assertive Community Treatment (ACT) team which would have given appellant access to a case manager, a psychiatrist, a therapist, and someone she could call 24 hours a day. The child protection worker encouraged appellant to set up an appointment with a home health care nurse or an Adult Rehabilitative Mental Health Services (ARMHS) worker to help appellant organize her day, arrive at appointments on time, and monitor her mental health symptoms on a more frequent basis. Appellant declined these services.

On May 1, the juvenile court filed an order adjudicating appellant's children to be children in need of protection or services (CHIPS) and continuing the children in foster care. The juvenile court adjudicated appellant's children CHIPS because they were "without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of the children's parent." *See* Minn. Stat. § 260C.007, subd. 6(8) (2012). The juvenile court ordered appellant to comply with and successfully complete a child protection case plan. This case plan incorporated the components of the case plan

4

set by the mental health court. It also required appellant to maintain safe housing and complete a parenting assessment.

To help appellant address her mental health issues and maintain compliance with the juvenile court's orders, the child protection worker provided appellant with bus cards, phone cards, home-furnishing assistance, and various other services. The mental health care manager offered appellant the services of an ACT team member and an ARMHS worker. In addition, the mental health care manager offered appellant personal care assistant (PCA) services and representative payee services to assist appellant in managing her money. Appellant declined each of these services.

Although appellant continued to have difficulty addressing her mental health needs, the child protection worker described appellant's compliance with the case plan as "good" at the beginning, and appellant was allowed unsupervised visits with her children. On July 8, the foster parents caring for appellant's children reported that appellant had returned her children late from a scheduled visit, and the children were soaking wet from swimming in their clothes. On July 12, the foster parents called to report that appellant had not returned the children to the foster parents. In an attempt to locate the children, police officers conducted a health and welfare check at both appellant's current address and the home of a relative of appellant, but they could not find appellant or the children. The child protection worker visited appellant's house the following morning, and appellant was still not there. That afternoon, the child protection worker received a call from appellant, who stated that she had the children. Police officers picked up the children. As a result of that incident, the juvenile court returned appellant to supervised

visits. Appellant spent approximately one week in jail in July for depriving the foster parents of custodial rights.[2]

Appellant then became inconsistent about visiting her children and frequently missed her supervised visits. Appellant missed two visits with her children in August and missed all of the visits in September. The child protection worker's notes documenting visits for August through October reflect a "theme" of appellant's difficulty focusing on her children and supervising them appropriately. The child protection worker ultimately canceled the visits due to appellant's failure to show up. The child protection worker testified that it was hard on the children when appellant did not show up for these visits. Between August and October, appellant did not contact the foster parents or check up on the well-being of her children.

Not only was appellant not visiting her children, but it became a "struggle" for appellant's care providers to get in contact with her to ensure that she was complying with the terms of her case plan. Appellant's clinical psychologist reported that appellant exhibited a "pattern of no-shows" for her psychiatric appointments and was not taking her medications as prescribed. The clinical psychologist referred appellant to an ARMHS worker to help her with her daily routine, teach her how to manage her symptoms at home, organize herself, and get extra help if needed. The ARMHS worker made three attempts to contact appellant and spoke with appellant once, but appellant did not cooperate with the ARMHS worker. The clinical psychologist testified that she tried

---

[2] Appellant had also spent time in jail on theft for approximately two weeks in May and one week in June.

6

to arrange programs to meet appellant's needs but that appellant had difficulty following through with these services.

The mental health care manager testified that she worked with appellant from April 2013 to October 2013. Appellant was expected to contact her mental health care manager at least once a month in order to remain compliant with the terms of her stayed civil commitment. Despite multiple attempts by the mental health care manager to contact appellant in August and September, there was no contact between appellant and the mental health care manager during those months. On August 1, the mental health care manager attempted to provide appellant with transportation to meet with appellant's probation officer, but appellant did not show up for the appointment. The mental health care manager then went to appellant's home, knocked on her door, and attempted to call her, but she was unable to reach appellant. The mental health care manager closed appellant's file as of October 1, 2013, because appellant did not meet her goals and was not engaging in services or remaining in contact with her mental health care manager.

The child protection worker testified that appellant reported that she was attending her meetings and appointments as required. When the child protection worker called to confirm that appellant was attending her appointments, however, the child protection worker learned that appellant was not, in fact, attending her appointments as required. Further, appellant was required to notify the child protection worker of her residence to ensure that she was maintaining safe and stable housing. Appellant failed to appear for two scheduled appointments to provide access to her house, and she only knew her three-digit address but not the name of the street on which she lived. The child protection

worker made a number of attempts to contact appellant, but appellant's phone was not in service, and the child protection worker's most recent letter to appellant was returned as undeliverable. The child protection worker then contacted the other individuals who were working with appellant in an attempt to find her, but appellant had not maintained contact with anyone.

When appellant missed a criminal court appearance in August, the district court issued a warrant for her arrest. Appellant was taken into custody on that warrant on October 8 and remained in jail until November 12. The child protection worker visited appellant in jail and testified that appellant admitted that she had dropped out of contact between August and October because she knew there was an outstanding warrant for her arrest. The child protection worker testified that appellant seemed unaware of how long it had been since she had seen her children and that it was unclear whether appellant was taking her medication.

On October 22, the Hennepin County Human Services and Public Health Department (the county) petitioned to terminate appellant's parental rights or transfer permanent legal and physical custody of the children. The parties appeared before the juvenile court on November 6 for an admit/deny hearing. The juvenile court found that the permanency petition made a prima facie case for permanency and that the matter should proceed for further hearing. Appellant was arrested on a new theft charge in December and remained in jail from December 19 to January 23. As of the date of the permanency trial, appellant estimated that in the past 10 months she had been in jail 4 or 5 times, for approximately 12 weeks total.

The trial was held on January 16 and February 4-5, 2014. Appellant testified that she had been diagnosed with schizophrenia, depression, and ADHD, but she did not think her mental health issues affected her ability to parent her children. Appellant acknowledged that there were a number of times when she did not comply with the requirements of her case plan. She admitted to using marijuana a couple of times a month and acknowledged that she had not been taking her medications as prescribed.[3] Appellant admitted that she did not follow through with the recommendations of a parenting assessment and did not meet with an ARMHS worker, a PCA, or a team nurse.

The child protection worker testified that, overall, appellant did not comply with the expectations of her case plan and did not seem to understand the extent to which her mental illness led to her neglect of her children. The child protection worker testified that appellant had not accepted the care necessary to address her mental illness, including medication and therapy. The child protection worker noted that appellant did not seem to have the skills necessary to problem-solve, deal with stress, or effectively care for herself, let alone her children, and was unwilling to live in her house. The child protection worker stated that it was unlikely appellant would be able to meet these expectations for the foreseeable future.

The juvenile court also heard testimony from the guardian ad litem, who had been assigned to the case for approximately ten months. The guardian ad litem observed that,

---

[3] The child protection worker also did not believe that appellant was taking her medication. Although appellant was expected to submit to urinalysis each month, she only provided two samples, the most current of which tested positive for THC, a metabolite of marijuana.

9

when the case was first opened, the children were not getting their general needs met. The guardian ad litem testified that appellant did not have stable housing, had no furniture or food in the home, and had no ability to get furniture or food in the home. The guardian ad litem also expressed concern that, even if these needs were met, appellant would not meet the educational needs of her children, Tam.B. and K.B., who receive special education through the school system, including play, speech, and occupational therapy. The child protection worker likewise testified that appellant's children have special needs that require continuous, predictable care. Both of these witnesses expressed concern about appellant's ability to get the children to their appointments.

Following trial, the juvenile court requested proposed findings of fact from the parties. The county submitted its proposed findings on February 19. On February 24, appellant's counsel submitted a letter stating:

> As my proposed findings, therefore, I ask that the court adopt [the county's] proposed findings of fact as to the history of the case but conclude that [the children] continue under Chips jurisdiction in order to give [appellant] additional time to work on her case plan now that she is not incarcerated.

After reviewing the entire file, including the testimony, exhibits, arguments, and proceedings, the juvenile court adopted a portion of the county's proposed findings. The juvenile court also made additional findings of its own.

On February 27, 2014, the juvenile court terminated appellant's parental rights to Tam.B. and K.B. The juvenile court specifically found that it was "clear that [appellant]

10

loves her children very much, but has not demonstrated a consistent desire or ability to participate in her case plan. Nor has she demonstrated the ability to put her children's interests above her own."

The juvenile court found that appellant had not demonstrated an ability "to address [her] issues that negatively impact [her] ability to parent the children" and further found that appellant would not be able to care for her children "for the reasonably foreseeable future." The juvenile court also made a finding that the "family's issues with criminal activity, domestic violence, chemical dependency, parenting and mental health are longstanding."[4]

Therefore, the juvenile court found that it was in the best interests of the children that appellant's parental rights be terminated. The juvenile court determined that there were four statutory grounds justifying the termination of appellant's parental rights: (1) appellant substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon her by the parent and child relationship; (2) appellant was palpably unfit to be a part of the parent and child relationship; (3) following the children's placement out of the home, reasonable efforts failed to correct the conditions leading to the placement; and (4) the children were neglected and in foster care. *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5), (8) (2012). The juvenile court concluded that there was clear and convincing evidence supporting each of these grounds and

---

[4] Appellant's history includes ten previous child protection assessments based on findings of neglect or abuse, two previous case filings, frequent hospitalizations related to her mental health, poor compliance with taking her medications, an unwillingness to live in her house, drug use, lack of cooperation with her child's schooling, and failure to remain up to date with her children's shots and doctor visits.

11

further found that the county made reasonable efforts to reunite the family. Appellant filed a motion for a new trial, which was denied. This appeal followed.

## D E C I S I O N

Whether to terminate parental rights "is always discretionary with the juvenile court." *In re Welfare of Child of R.D.L.*, ___ N.W.2d ___, ___, 2014 WL 4437630, at *8 (Minn. Sept. 10, 2014). An appellate court reviews "the record carefully to determine whether the evidence is clear and convincing" to support the district court's order to terminate parental rights. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). We give "[c]onsiderable deference" to the district court's decision to terminate parental rights because the district court "is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996). Accordingly, an appellate court will affirm a district court's termination of parental rights if "at least one statutory ground alleged in the petition is supported by clear and convincing evidence and termination of parental rights is in the child's best interests." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008).

Appellant argues the juvenile court erred when it found that the county made the required reasonable efforts to correct the conditions leading to out-of-home placement. Appellant also challenges the juvenile court's finding that termination was in the best interests of the children when the county had not yet identified a permanent placement option for the children. A review of the record supports the juvenile court's findings regarding reasonable efforts and best interests of the children.

12

# I.

In a termination proceeding, the county must demonstrate that it made "reasonable efforts" to reunite the family. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005); *see also* Minn. Stat. § 260.012(f), (h) (2012); Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(1) (directing the district court to make "specific findings" regarding "the nature and extent of efforts made by the responsible social services agency to rehabilitate the parent and reunite the family"). "Reasonable efforts" involve "the exercise of due diligence by the responsible social services agency to use culturally appropriate and available services to meet the needs of the child and the child's family." Minn. Stat. § 260.012(f). The district court is required to make findings and conclusions as to the provision of reasonable efforts or, in the alternative, may find that the provision of services or additional services would be futile. *Id.* (h). When determining whether reasonable efforts have been made, the district court must consider whether the services were: "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." *Id*. The "nature of the services which constitute reasonable efforts depends on the problem presented" in each case. *T.R.*, 750 N.W.2d at 664 (quotation omitted).

With respect to the reasonableness of the county's efforts to correct the conditions leading to the children's out-of-home placement, it is undisputed that appellant suffered from significant mental health issues and that those issues resulted in both the mental health and juvenile court issuing orders. Following her stayed civil commitment in

13

March 2013, the mental health court ordered appellant to follow the directions of her treatment team, take her medications as prescribed, participate in aftercare planning, cooperate with the county social worker, return phone calls, and keep appointments. Following the initial hearing in mental health court, the child protection worker designed a case plan for appellant to help address her mental health issues and maintain her compliance with the terms of the stayed commitment. Appellant was expected to continue to take her medications, work with her therapist and other mental health providers, submit to urinalyses, and complete a parenting assessment. Following the CHIPS adjudication in May 2013, appellant was ordered to comply with and successfully complete a case plan, which included the requirements previously imposed by the mental health court as well as requirements to participate in individual therapy, obtain and maintain safe housing, work with a mental health rehabilitation worker, and complete a parenting assessment.

The juvenile court found that the county's services provided a "meaningful opportunity" to address the family's issues and were "timely, available, relevant and culturally appropriate" to "remedy the circumstances requiring the foster care placement and permit reunification." The child protection worker testified that the tasks and goals of the case plan were relevant to the safety of the children, adequate to meet the needs of the family, culturally appropriate, available and accessible, consistent and timely, and realistic under the circumstances.

Specifically, the county elicited testimony from appellant's care providers regarding their efforts to help appellant comply with her case plan. The child protection

worker provided appellant with bus cards, phone cards, and home-furnishing assistance. Appellant was also offered the services of an ACT team composed of a case manager, a psychiatrist, and a therapist. The child protection worker encouraged appellant to set up an appointment with a home health care nurse or an ARMHS worker to help appellant monitor her mental health symptoms and stay compliant with her medication. The mental health care manager further tried to connect appellant with an ACT team member, an ARMHS worker, a PCA, and a representative payee. The clinical psychologist referred appellant to an ARMHS worker who made three attempts to contact appellant. Appellant refused each of these services.

Although appellant was initially compliant with her case plan, she began to disengage in July 2013 and stopped visiting her children or responding to repeated attempts to reach her. The child protection worker, mental health care manager, and clinical psychologist all testified regarding their efforts to contact appellant.

The juvenile court found that the case plan and services offered by the county were "reasonable and appropriate," and that appellant had not sufficiently engaged in her case plan and only "minimally participated" in services. These findings are consistent with the record. The juvenile court found that the county provided appellant with an array of services, including targeted case management services, referral for psychological, mental, or behavioral health services, psychological evaluation, referral for psychiatric services/medication management, housing assistance, a parenting assessment and education, in-home parenting services, ARMHS services, coordination with probation services and the Department of Corrections, foster care services,

15

transportation and phone assistance, child protection and child services case management services, supervised and unsupervised visitation, and kinship search services. The juvenile court's factual findings regarding the county's reunification efforts are substantial and allow for a meaningful review by this court. The record provides clear and convincing evidence supporting the juvenile court's finding that the efforts made to reunite appellant with her children were reasonable.

Appellant argues that the county should have put forth an "extraordinary effort" to reunify her family, given her mental health and poverty. Section 260.012 requires the county to provide reasonable—as opposed to extraordinary—efforts. Minn. Stat. § 260.012(a) (2012). Reasonable efforts at rehabilitation are services that go "beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotation omitted), *review denied* (Minn. Mar. 28, 2007). Appellant testified that the elements of her case plan were "too much" for her. The child protection worker testified that she "empathize[d]" with appellant's feelings of being overwhelmed and counseled appellant to focus on her mental health first, as that was the primary reason her case was initiated. Appellant's care providers attempted to work together to accommodate appellant's needs. At her request, appellant was referred to NorthPoint for primary care, individual therapy, and psychiatric services to continue working with her therapist. Appellant, however, did not engage in these services.

Appellant claims that the county's top priority should have been securing safe housing for her. However, the county elicited compelling testimony that appellant's care

providers did, in fact, attempt to stabilize appellant's living situation. Appellant reported that she was having delusions and hearing voices telling her to get out of her house. In response, the county helped appellant move into a new house. Appellant claimed that people were coming through her new house and stealing everything from her, and she refused to live in it. The child protection worker testified that it was "unclear" whether any thefts had actually occurred, as appellant never allowed her to enter the home to ensure that she was providing safe and stable housing for her children. The juvenile court heard testimony that as of August 2013, the county considered it "nearly impossible" to move appellant to a third house because she would have been considered ineligible for assistance given her two prior section 8 housing arrangements.

The juvenile court found that the county's witnesses testified "credibly and persuasively" that they put forth reasonable efforts to help appellant comply with her case plan, and we defer to those credibility determinations. *See L.A.F.*, 554 N.W.2d at 396. The county provided appellant with an array of services and demonstrated "real, genuine assistance" to help her comply with the terms of her case plan. *See S.W.*, 727 N.W.2d at 150. The juvenile court did not clearly err in finding that the county undertook reasonable efforts at reunifying appellant with her children.

Because this record contains clear and convincing evidence supporting these findings, the juvenile court's determination that the reunification efforts in this case were reasonable is not clearly erroneous.

*Sufficient Time to Address Appellant's Issues*

Appellant also argues that the county "fast-tracked" the termination proceedings and should have allowed her more time to progress on her case plan prior to seeking termination of her parental rights. Minnesota statute requires the court to conduct a permanency progress review hearing "no later than six months after the child's placement." Minn. Stat. § 260C.204(a) (2012). The court, in its discretion, may continue the matter up to a total of six additional months if the court finds that the parent "has maintained contact with the child and is complying with the court-ordered out-of-home placement plan, and if the child would benefit from reunification with the parent." *Id.* (c)(1) (2012). However, if the court determines that the parent has not complied with the placement plan or is not maintaining regular contact with the child, the court may proceed with a permanent placement plan for the child away from the parent. *Id.* (c)(2) (2012).

Here, an emergency protective care hearing for appellant's children was held in March 2013, and the juvenile court issued an order for protective care and out-of-home placement. In May, the children were adjudicated CHIPS. A petition to terminate parental rights or transfer permanent legal and physical custody was filed on October 22. By that point, appellant had stopped communicating with her children, was not making progress on her case plan, and was not remaining in contact with her care providers.

The juvenile court held an admit/deny hearing on the permanency petition in November, at which point K.B. and Tam.B. had been in out-of-home placement for 242 days. The juvenile court found that the permanency petition articulated a prima facie

case for permanency and that the matter should proceed to trial. The juvenile court clearly did not abuse its discretion given appellant's lack of contact with her children and lack of progress on her case plan.

Although appellant argues that the county unfairly expedited her case, she has not identified any authority or evidence to suggest that she would have completed her case plan or made progress on her mental health goals if given additional time. As stated above, appellant was unable to address her own significant issues, let alone meet the needs of her children. Further, we are mindful that "[e]ach delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home and can seriously affect a child's chance for permanent placement." *In re Welfare of J.R., Jr*., 655 N.W.2d 1, 5 (Minn. 2003). *See generally* Minn. Stat. § 260C.001, subd. 3(2) (2012) (stating that one of the purposes of permanency proceedings is "to secure for the child a safe and permanent placement").

Here, the juvenile court found that appellant was provided with "sufficient time and opportunity to address her mental health and other issues" but demonstrated "no momentum" in addressing those issues. The evidence in the record amply supports the juvenile court's finding that "[m]ore time will simply result in more instability for these children and unnecessarily delay permanency." When balancing the children's interests with those of appellant, the children's immediate need for a stable permanent home "outweighs" appellant's desire for more time to comply with her case plan, *see In re Welfare of Udstuen*, 349 N.W.2d 300, 305 (Minn. App. 1984), this record contains clear

19

and convincing support for the juvenile court's factual determinations, and the juvenile court did not abuse its discretion.

*Individualized Case Plan for Parent Living with Mental Illness in Poverty*

Appellant also argues that efforts undertaken by the county were not "individualized and explicit" to the needs of a parent who suffers from mental illness and lives in poverty. Appellant is correct that "[m]ere poverty" of a parent is "seldom, if ever, a sufficient ground" for terminating parental rights. *In re Klugman*, 256 Minn. 113, 120, 97 N.W.2d 425, 430 (1959). Additionally, mental illness, in and of itself, "does not permit termination of parental rights." *T.R.*, 750 N.W.2d at 661 (quotation omitted). Instead, a district court is instructed to consider the "actual conduct of the parent." *Id.* (quotation omitted).

Appellant claims her case is analogous to *In re Welfare of Children of B.M.*, in which this court reversed a district court order terminating the parental rights of a mentally impaired parent. 845 N.W.2d 558, 565-66 (Minn. App. 2014). The present case is readily distinguishable. First, this court reversed and remanded *B.M.* based in part on the district court's failure to make a specific finding that the county made reasonable efforts to reunify the parent with the child. *Id.* at 566. The juvenile court here, however, made several specific and detailed findings related to the county's efforts to reunite appellant with her children. Second, the *B.M.* court found it "significant that appellant has recognized his shortcomings and has obtained the necessary help by utilizing a representative payee, obtaining and maintaining his financial assistance, taking additional classes, and reaching out to his mother for support and guidance." *Id.* at 565. In contrast,

20

the juvenile court here found that appellant's overall testimony "showed a lack of insight into her mental health and its impact on her daily living and ability to parent her children." This record shows that appellant's rights were terminated *not* on account of her poverty or mental illness but due to her "actual conduct." *See T.R.*, 750 N.W.2d at 661.

## II.

Appellant argues that termination of her parental rights was improper because the county had not yet finalized a permanent placement plan for the children. Appellant's position is not supported by controlling law. Minnesota statute provides that:

> When the court terminates parental rights of both parents or of the only known living legal parent, the court *shall* order the guardianship of the child to: (1) the commissioner of human services; (2) a licensed child-placing agency; or (3) an individual who is willing and capable of assuming the appropriate duties and responsibilities to the child.

Minn. Stat. § 260C.325, subd. 1(a) (2012) (emphasis added); *see* Minn. Stat. § 645.44, subd. 16 (2012) ("'Shall' is mandatory.").

The juvenile court concluded that it was in the "best interests of the children that any and all parental rights be terminated." Appellant's children have been out of the home since March 2013, and Tam.B. and K.B. have been placed in nonrelative homes since October 2013 while the county continues to seek out a permanent home. The social worker testified that the children have "settled into" their foster placement, are "doing well," and "play together amazingly well" during her visits. The children are up to date

with their shots and doctor's visits and have exhibited fewer behavioral difficulties since leaving appellant's home.

The juvenile court recognized that the county "continues to seek a permanent home for the children prioritizing relatives." The county has not yet been able to identify any appropriate relatives. The juvenile court terminated appellant's parental rights to K.B. and Tam.B. and, because an appropriate individual had not yet been identified, appointed the Minnesota Commissioner of Human Services as the children's guardian. Having determined that terminating appellant's parental rights was in the best interests of the children, the juvenile court correctly adhered to Minnesota statute in directing the children to the care of the county. *See* Minn. Stat. § 260C.325, subd. 1(a), (b) (2012) (directing that the court "shall" order guardianship); *In re Welfare of J.M.*, 574 N.W.2d 717, 724 (Minn. 1998) (holding that the "termination statute does not require assessment of a child's adoptability as part of the analysis of the child's best interests"); *In re Welfare of P.J.K.*, 369 N.W.2d 286, 292 (Minn. 1985) ("[N]owhere in the statute is imminent adoption an element of a termination proceeding."). Therefore, the juvenile court did not err by terminating appellant's parental rights when the county had not yet finalized a permanent placement plan for the children.

**Affirmed.**